FILED
2022 Mar-02  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DARRELL TREMAYNE SULLIVAN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | **Case No.: 2:20-CV-01000-MHH** |
| **v.** | } | |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Darrell Sullivan seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Commissioner denied Mr. Sullivan's claim for supplemental security income, finding that Mr. Sullivan was not disabled. Mr. Sullivan contends that the Administrative Law Judge—the ALJ—improperly evaluated his cardiovascular

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

impairment and concluded erroneously that he did not meet Listing 4.02, Chronic Heart Failure. After careful review, the Court affirms the Commissioner's decision.

## LEGAL STANDARD FOR SSI APPEALS

To be eligible for SSI, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[2]

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[2] Title II of the Social Security Act governs claims for disability benefits for insured individuals. Title XVI of the Social Security Act governs individuals' claims for Supplemental Security Income. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (last visited February 22, 2022).

*Winschel*, *v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## PROCEDURAL BACKGROUD

Mr. Sullivan applied for SSI on September 19, 2017. (Doc. 10-4, p. 2). Mr. Sullivan alleges that his disability began on August 17, 2016. (Doc. 10-6, p. 2). The Commissioner denied Mr. Sullivan's claim on March 13, 2018. (Doc. 10-4, pp. 2-3). Mr. Sullivan requested a hearing before an Administrative Law Judge. (Doc. 10-5, pp. 9-13). The ALJ issued a decision on July 23, 2019. (Doc. 10-3, pp. 22-24). On September 11, 2019, Mr. Sullivan filed with the Appeals Council exceptions to the ALJ's decision. (Doc. 10-5, pp. 67-69). The Appeals Council denied Mr. Sullivan's request for review (Doc. 10-5, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## MR. SULLIVAN'S ADMINISTRATIVE RECORD

### *Mr. Sullivan's Medical Records*

To support his SSI application, Mr. Sullivan submitted medical records that relate to diagnoses and treatment of and opinions about his mental illness, heart condition, cirrhosis, hypertension, umbilical hernia, alcohol abuse, and gastroesophageal reflux disease.  The Court has reviewed the medical records that appear in the administrative record.  For purposes of Mr. Sullivan's argument before the Court concerning his heart condition, the following records are relevant.

Mr. Sullivan sought treatment in the Emergency Department at the VA Hospital in Birmingham, Alabama on August 15, 2017.  (Doc. 10-9, p. 54; Doc. 10-12, pp. 64-65, 68-70).  Mr. Sullivan complained of abdominal pain that had lasted 12 hours.  He reported tightness in his chest and episodes of shortness of breath with exertion that occurred over several weeks.  (Doc. 10-9, p. 54; Doc. 10-12, pp. 64-65, 68-70).  Mr. Sullivan stated that he could walk 50 to 60 feet before feeling short of breath, but the shortness of breath did not significantly impact his activities of daily living. (Doc. 10-9, p. 54; Doc. 10-12, pp. 64-65, 68-70).  Mr. Sullivan had an EKG that was "concerning for prior infarct."  (Doc. 9-10, p. 58).[3]  He was admitted to the hospital for additional testing.  (Doc. 10-12, pp. 64-65, 68-70).

___

[3] A myocardial infarction is a heart attack.  During a heart attack, blood flow to the heart is diminished,      causing      heart      tissue      to      lose      oxygen      and      die.

Mr. Sullivan had a chemical cardiac stress test the next day. (Doc. 10-8, p. 66; Doc. 10-9, pp. 8, 18). During the test, Mr. Sullivan did not complain of chest pain, but he experienced shortness of breath and facial flushing. (Doc. 10-9, p. 8). Mr. Sullivan left the hospital before the second part of the stress test, and that part of the test was conducted on an outpatient basis. (Doc. 10-8, p. 66).[4] The stress test indicated several problems with the left side of Mr. Sullivan's heart. The stress test impression notes state: "there is scan evidence for a large area of scar within the LAD and LCx territories, involving approximately 45-50% of the myocardium. There is evidence for severe stress and resting LV dysfunction and dilation." (Doc. 10-8, p. 67). Mr. Sullivan's rest ejection fraction or EF was 25%, and he had severe global hypokinesis and anterior and apical kinesis. (Doc. 10-8, pp. 66-67). Mr. Sullivan reported that he was active at home. He explained that he was able to walk three flights of stairs without symptoms and worked out in his gym two days a week. (Doc. 10-8, p. 66).

On September 6, 2016, Mr. Sullivan visited the cardiology clinic at the VA Hospital. (Doc. 10-8, pp. 70-71). Mr. Sullivan complained of abdominal pain. He did not report chest pain, and he stated that he had no problem going up flights of

---

https://my.clevelandclinic.org/health/diseases/16818-heart-attack-myocardial-infarction     (last visited Feb. 28, 2022).

[4] The second part of the test appeared to be diagnostic imaging. (Doc. 10-9, p. 8).

stairs.  Mr. Sullivan reported that he worked out at the gym two days a week.  (Doc. 10-8, pp. 70-71).  The examining physician indicated that Mr. Sullivan had "no signs of heart failure on physical exam."  (Doc. 10-8, p. 70)  The doctor discussed with Mr. Sullivan further testing and procedures for systolic dysfunction including a left heart catheterization.  (Doc. 10-8, pp. 70-71).  Mr. Sullivan stated that he would be interested in the heart catheterization but only after his gastrointestinal work-up was complete.  (Doc. 10-8, pp. 70-71).  Mr. Sullivan's doctor "[s]tressed the importance of medication adherence and follow-up and of having the" left heart catheterization. (Doc. 10-8, p. 71).

Mr. Sullivan had an appointment at the cardiology clinic on December 7, 2016.  (Doc. 10-8, p. 186).  Mr. Sullivan was upset that his abdominal pain was not being addressed.  He asked why "so much focus had been given to his heart."  (Doc. 10-8, p. 186).  He had no chest pain, PND, orthopnea, or LE edema.  (Doc. 10-8, p. 186).[5]  Dr. Payne noted that Mr. Sullivan did not show up for his heart catherization

---

[5] PND, orthopnea, and LE edema are symptoms commonly associated with chronic heart failure. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 4.00D2b(i)-(ii).

Paroxysmal nocturnal dyspnea—PND—is a condition that triggers sudden shortness of breath during sleep.  https://www.medicalnewstoday.com/articles/paroxysmal-nocturnal-dyspnea (last visited February 28, 2022).

"Orthopnea is the sensation of breathlessness in the recumbent position." https://www.ncbi.nlm.nih.gov/books/NBK213/#:~:text=Orthopnea%20is%20the%20sensation%20of,relieved%20in%20the%20upright%20position (last visited February 28, 2022).

procedure.  Dr. Payne also noted that Mr. Sullivan was hesitant to reschedule the procedure until he resolved his abdominal pain.  (Doc. 10-8, p. 186).  Mr. Sullivan reported that he had stopped taking lisinopril and Coreg because he believed the medications lowered his blood pressure.  (Doc. 10-8, p. 186).

On April 19, 2017, Mr. Sullivan visited the cardiology clinic for a follow-up appointment.  (Doc. 10-8, p. 171).  Mr. Sullivan was not in acute distress.  His heart had a regular rhythm, normal rate, and no murmurs.  His blood pressure was 136/86.  (Doc.10-8, p. 177).  Dr. Cotney, Mr. Sullivan's cardiologist, indicated that she had discussed the need for a heart catheter with Mr. Sullivan on multiple visits, but Mr. Sullivan wanted to defer the procedure until his abdominal pain was resolved.  (Doc. 10-8, p. 175).  Dr. Cotney stated that she had encouraged Mr. Sullivan to comply with his medications.   Mr. Sullivan reported that he took the medications as prescribed for three to four weeks, but he stopped because he did not like the way the medications made him feel and how they interfered with his job and his memory. (Doc. 10-8, p. 175).  Dr. Cotney noted that Mr. Sullivan was fixated on abdominal pain and that Mr. Sullivan reported "wide fluctuations" in his heart rate at home that concerned him.  (Doc.10-8, p. 175).

---

LE edema is "the accumulation of fluid in the lower legs" or lower extremities. https://www.uofazcenteronaging.com/care-sheet/providers/lower-extremity-edema-older-adults. (last visited February 28, 2022).

Mr. Sullivan had a surgical consultation with Dr. Courtney Balentine for his umbilical hernia on April 24, 2017. (Doc. 10-8, pp. 44-45). Dr. Balentine noted that Mr. Sullivan noticed his hernia a year before, and he was treated in the ER for abdominal pain about nine months before. (Doc.10-8, p. 186; Doc. 10-11, p. 183). Dr. Balentine noted that Mr. Sullivan had "VERY severe cardiac disease." (Doc. 10-8, p. 45). Mr. Sullivan reported that he wanted to proceed with surgery for his hernia; however, Dr. Balentine encouraged Mr. Sullivan to reconsider the heart catheter to reach medical optimization before having surgery on his hernia. (Doc. 10-8, p. 49). Dr. Balentine wrote that Mr. Sullivan had refused a heart catheterization "because of inability to comply with medications." (Doc. 10-8, p. 49).

Mr. Sullivan visited the cardiology clinic the same day and spoke with a cardiology fellow about a heart catheter. Mr. Sullivan decided to have the procedure. (Doc. 10-8, p. 158). Mr. Sullivan spoke with a medical support assistant the next day to schedule the procedure for May 11, 2017. (Doc. 10-8, p. 157).

On May 1, 2017, Mr. Sullivan visited the primary care clinic at the VA Hospital as a walk-in. (Doc. 10-8, p. 151). Mr. Sullivan visited the clinic for disability consultation. (Doc. 10-8, p. 151). Mr. Sullivan complained of chronic abdominal pain, but he did not report new symptoms. Mr. Sullivan reported that he had stopped taking metoprolol and lisinopril after using the medication for five days because the medication made him feel out of it. (Doc. 10-8, p. 151). He reported

that his abdominal pain improved with exercise. He explained that because his medication made him feel out of it, he had not been able to exercise. (Doc. 10-8, p. 151).

Mr. Sullivan visited the primary care clinic as a walk-in on May 9, 2017. (Doc. 10-8, p. 149). Mr. Sullivan wanted to discuss the heart catheterization scheduled for May 11, 2017. (Doc. 10-8, p. 149). According to progress notes, Mr. Sullivan reported that he could not take Plavix because it bothered his stomach and "[made] him sleep 16 hours a day." Mr. Sullivan stated that if he had the catheter, he would not allow stents because he could not take Plavix or similar medications. (Doc. 10-8, p. 149). The CRNP who met with Mr. Sullivan relayed Mr. Sullivan's concerns to his cardiologist, Dr. Cotney. Dr. Cotney replied, "if [Mr. Sullivan] is not going to get stents if he needs them we can hold off on the cath until he gets his stomach evaluated." (Doc. 10-8, p. 149).

On June 12, 2017, Mr. Sullivan visited the primary care clinic. (Doc. 10-8, p. 123). Mr. Sullivan reported constant low-level abdominal pain with an episode of severe pain three days earlier. Regarding his heart condition, Mr. Sullivan indicated that he did not have palpitations, orthopnea, PND, or LE edema, and he stated that he was walking five miles daily. (Doc. 10-8, p. 123). Mr. Sullivan stated that he had chest and left arm pain when he took Plavix, but he had "no pain since he stopped taking the medication." (Doc. 10-8, p. 123). He explained that he could not tolerate

Plavix, lisinopril, or pantoprazole, and he stated that he did not have the heart catheter procedure because he could not take Plavix.  (Doc. 10-8, p. 123).  Mr. Sullivan's physical examination showed that he was not in acute distress, and he had no murmurs, rubs, or gallops.  (Doc. 10-8, p. 126).  Mr. Sullivan's BMI was 34.1. (Doc. 10-8, p. 130).  On a "functional screen," Mr. Sullivan was scored "Independent."  (Doc. 10-8, p. 129).

Mr. Sullivan attended a follow-up appointment at the primary care clinic on August 14, 2017.  (Doc. 10-8, p. 111).  Mr. Sullivan reported that he was walking five miles a day three times a week.  He did not report chest pain or palpitations. (Doc. 10-8, p. 111).  Mr. Sullivan had lost 15 pounds.  (Doc. 10-8, p. 111).  Mr. Sullivan stated that he discontinued all medications because the medications caused stomach pain.  (Doc. 10-8, p. 111).  Mr. Sullivan was instructed to contact the clinic if he had concerns, questions, or symptoms.  (Doc. 10-8, p. 115).

Mr. Sullivan had a follow-up visit at the cardiology clinic on November 15, 2017.  (Doc. 10-9, p. 163).  According to progress notes, Mr. Sullivan was a tobacco user with a diagnosis of presumed ischemic cardiomyopathy with an ejection fraction of less than 25%.  (Doc. 10-9, p. 163).[6]  The progress notes reflect that Mr.

---

[6] "Ischemic cardiomyopathy (CM) is the most common type of dilated cardiomyopathy.  In Ischemic CM, the heart's ability to pump blood is decreased because the heart's main pumping chamber, the left ventricle, is enlarged, dilated and weak." https://my.clevelandclinic.org/health/diseases/17145-ischemic-cardiomyopathy#:~:text=Ischemic%20cardiomyopathy%20(CM)%20is%20the,is%20enlarged%2C%20dilated%20and%20weak. (last visited February 28, 2022).

Sullivan had been resistant to a heart catherization procedure.  Mr. Sullivan indicated that he would be interested in pursuing a heart catheter only if he obtained disability. He explained that if he received disability, he could take his medication without having to worry about feeling badly at work.  (Doc. 10-9, p. 163).  The impressions and treatment plan in the progress notes indicate that Mr. Sullivan had presumed cardiomyopathy and was noncompliant with prescribed medication.  (Doc. 10-9, p. 165).  The notes also indicate that Mr. Sullivan was adamant about not pursuing ischemic evaluation and that he was not taking his cardiac medication except for Toprolol XL.  (Doc. 10-9, p. 165).  Dr. Cotney instructed Mr. Sullivan to continue Toprolol and to restart low dose lisinopril. (Doc. 10-9, p. 165).

Mr. Sullivan had an echocardiogram on February 12, 2018.  (Doc. 10-9, p. 168).  The echocardiogram showed that Mr. Sullivan had heart failure, unspecified. (Doc. 10-9, p. 168).  Mr. Sullivan's left ventricle chamber was severely dilated, and his left ventricle systolic function was severely reduced.  (Doc. 10-9, p. 168).  Mr. Sullivan had severe global hypokinesis, and his septal wall appeared akinetic. His estimated left ventricle ejection fraction was 15-20% (abnormal).

On February 19, 2018, Mr. Sullivan visited Cassandra Frieson, a certified nurse practitioner, for a consultative examination.  (Doc. 10-9, pp. 175-79).  Ms. Frieson spoke with Mr. Sullivan, examined his records, and examined his responses to a questionnaire.  (Doc. 10-9, pp. 175-79).  Ms. Frieson reported that Mr. Sullivan

had systolic heart failure with an ejection fraction of less than 25%. (Doc. 10-9, p. 179). He had a BMI of 34.5, placing him in the obese category. (Doc. 10-9, p. 177). She indicated that because of the severity of his symptoms, Mr. Sullivan had difficulty performing activities, such as chores, shopping, standing, and lifting objects. (Doc. 10-9, p. 179). Despite those limitations, CRNP Frieson opined that Mr. Sullivan could perform activities of daily living, drive, manage money, sit and talk without constraints, understand and follow directions, and use his arms, hands, and fingers. (Doc. 10-9, p. 179).

On April 6, 2018, Mr. Sullivan visited the emergency department at the VA Hospital. He reported chest pain that began while he was having an argument with his mother. (Doc. 10-11, pp. 80, 115-17). He reported that he had no shortness of breath, nausea, or vomiting. (Doc. 10-11, p. 80). Mr. Sullivan's initial cardiac markers were within normal limits. He had an ECG with no ischemic changes and an EKG that showed no significant changes from his prior EKG. (Doc. 10-11, p. 80). Mr. Sullivan indicated that he was feeling better and that his chest pain was almost completely resolved. Mr. Sullivan was admitted for further evaluation. (Doc.10-11, p. 117). He was discharged on April 8, 2018. (Doc. 10-11, pp. 37, 53).

On April 13, 2018, Mr. Sullivan had a follow-up appointment in the primary care clinic. (Doc. 10-11, pp. 37-38). Mr. Sullivan reported that he did not have chest pain, palpitations, orthopnea, or PND following his discharge on April 8. Mr.

Sullivan stated that he was doing minimal activities and was not exercising regularly. (Doc. 10-11, pp. 37-38).

On April 23, 2018, Mr. Sullivan had an appointment in the mental health clinic at the VA Hospital.   (Doc. 10-11, pp. 26-27).  Mr. Sullivan indicated that his health stressors had worsened over two years.  (Doc. 10-11, p. 27).  He reported that he could not do things he could do six months earlier.  Mr. Sullivan said he became winded when he walked to the mailbox.  (Doc. 10-11, p. 27).  He indicated that he felt fatigued and depressed and had difficulty concentrating. Mr. Sullivan reported that he slept approximately 12-14 hours a night.  (Doc. 10-11, p. 27).  Mr. Sullivan said he was concerned that his heart medications were too sedating.  (Doc. 10-11, p. 27).

Mr. Sullivan had an appointment in the cardiology clinic on May 30, 2018. (Doc. 10-10, pp. 198-99).  The doctor indicated that Mr. Sullivan was doing well. He noted that Mr. Sullivan tried to exercise by walking three miles a few times a week.  (Doc. 10-10, pp. 198-99).  Mr. Sullivan reported that he did not have chest pain, orthopnea, or LE edema.  (Doc. 10-10, pp. 198-99).  Mr. Sullivan stated that he was compliant with medications and that he was willing to have a heart catheter procedure.  (Doc. 10-10, p. 201).

On May 30, 2018, Mr. Sullivan had an appointment at the mental health clinic. (Doc. 10-10, pp. 206-13).  Mr. Sullivan reported frustration about his poor physical

health.  He reported that the combination of his heart condition and hernia caused him to lack energy and motivation.  (Doc. 10-10, pp. 206-13).  He stated that he believed it was physically impossible for him to work.  (Doc. 10-10, pp. 206-13).  Mr. Sullivan explained that he worked odd jobs to make enough money for his basic needs.  (Doc. 10-10, pp. 206-13).  Mr. Sullivan explained that he had refused to take part in the heart catheterization because the medication made him feel badly.  (Doc. 10-10, pp. 206-13).  The next day, Mr. Sullivan scheduled an appointment to have a catheter procedure on July 11, 2018.  (Doc. 10-10, p. 198).

On June 6, 2018, Mr. Sullivan had a psychiatry appointment at VA Hospital.  (Doc. 10-10, pp. 188-89).  Mr. Sullivan reported that he started walking in February of 2017.  He reported walking up to five miles a day.  (Doc. 10-10, pp. 188-89).  He explained that he slacked off walking in the winter, but he worked out using his Total Gym.  Mr. Sullivan indicated that while he was exercising, he had stopped taking all of his medications, but he had started taking his medication again.  He reported feeling tired during the day.  (Doc. 10-10, pp. 188-89).  The therapist suggested to Mr. Sullivan that his fatigue might be caused by his congestive heart failure, and the therapist encouraged Mr. Sullivan to speak to his cardiologist to get more information about a heart cath.  (Doc. 10-10, p. 189).

Mr. Sullivan had a catheter procedure on July 11, 2018.  (Doc. 10-10, pp. 165-68).  Mr. Sullivan's diagnosis was single vessel coronary disease, diffusely diseased

left anterior descending artery that extended into the first diagonal with appearance of prior healed dissection.  (Doc. 10-10, pp. 166-68).  After the procedure, Mr. Sullivan was alert, oriented, and not in pain.  (Doc. 10-10, p. 162).  Mr. Sullivan had no issues with his catheter site.  (Doc. 10-10, p. 162).  He had resumed normal activities by July 13, 2018.  (Doc. 10-10, p. 159).  He reported that he had been doing very minimal activities since the procedure.  (Doc. 10-10, p. 160).

*Mr. Sullivan's Administrative Hearing*

Mr. Sullivan's administrative hearing took place on April 18, 2019.  (Doc. 10-3, p. 44).  When the hearing began, Mr. Sullivan's attorney asked the ALJ to order a treadmill stress test to determine whether Mr. Sullivan met the listing for heart failure, Listing 4.02.  (Doc. 10-3, p. 46).  Mr. Sullivan's attorney stated that Mr. Sullivan met the ejection fraction criteria for Listing 4.02 because "his ejection fraction ha[d] always been under 25 percent."  (Doc. 10-3, p. 46).  The attorney explained that Mr. Sullivan had had another type of stress test (namely a chemical stress test) that showed a drop in his blood pressure, but the test results did not indicate how much his blood pressure dropped.  Mr. Sullivan's attorney noted that the Listing required a drop of at least ten millimeters of mercury.  (Doc. 10-3, p. 46).  The ALJ indicated that he would revisit the request for a stress test at the end of the hearing.  (Doc. 10-3, p. 47).

Mr. Sullivan testified that he lived with his mother.  (Doc. 10-3, p. 48).  He stated that he did not do much daily, but he washed dishes, cleaned around the house, cared for his hygiene, and dressed himself every day.  (Doc. 10-3, p. 60).  Mr. Sullivan testified that he had a car and that he could drive if he did not take his medication; his medication made it hard for him to function and caused blurry vision. (Doc. 10-3, pp. 48-49, 60).  He also stated that he could get the things he needed like groceries and clothing on his own.  (Doc. 10-3, pp. 60-61).  He testified that he did not leave the house often because he would see things that irritated him so much that he would "black out."  (Doc. 10-3, p. 61).  Mr. Sullivan explained that he would "snap."  (Doc. 10-3, p. 61).  Mr. Sullivan testified that he mostly prepared meals at home because he could not eat at a restaurant without stress.  (Doc. 10-3, p. 63).

Mr. Sullivan testified that he had vocational training in high school in commercial art.  (Doc. 10-3, p. 49).  Mr. Sullivan stated he was in the Air Force from 2002 to 2004.    He testified that his highest rank was E-4, senior airman, and that he had an honorable discharge.  (Doc. 10-5, p. 50).  Mr. Sullivan testified that he received most of his healthcare from the VA hospital, but he was not receiving disability monthly through the VA.  (Doc. 10-3, p. 51).

Mr. Sullivan testified that he began having heart issues in August of 2016. (Do. 10-3, p. 53).  He stated that he went to the doctor for a different issue but found out that he had had a massive heart attack.  (Doc. 10-3, p. 53).  Mr. Sullivan said his

condition felt like "pushing in on his chest." (Doc. 10-3, p. 54). Mr. Sullivan testified that he only felt pressure in his chest when he is lying down at night. (Doc. 10-3, p. 56). He stated that he would get winded while taking a flight of stairs, talking, or walking. (Doc. 10-3, p. 54). He explained that he would not get winded if he were walking in a Wal-Mart if it were flat. (Doc. 10-3, pp. 54-55). Mr. Sullivan testified that he noticed chest pressure when he exerted himself too much. (Doc. 10-3, p. 56). Mr. Sullivan testified that each time he had been hired for a job over the preceding three years, he could work for only two or three days because his body could not recover from the previous day's activity. (Doc. 10-3, p. 56).

When questioned about his mental health, Mr. Sullivan testified that his "mental issues have been [] some of the reasons of my lack of employment history." He testified that after two or three days of work, he would get fired or quit. (Doc. 10-3, p. 57). He testified that he was diagnosed with obsessive compulsive personality disorder, high functioning autism, and some form of depression. (Doc. 10-3, pp. 57-58). He explained that he was seeing a psychologist at the VA. Mr. Sullivan testified that he had a prescription to treat his anxiety and depression, but he stopped taking it because it was affecting his personality. (Doc. 10-3, pp. 58-59).

Regarding his past employment, the ALJ pointed out that Mr. Sullivan had not worked, other than briefly through a temp agency, in the preceding nine years. (Doc. 10-3, p. 53). Mr. Sullivan testified that he worked at O'Neal Steal as a material

handler. He explained that he loaded a flatbed trailer with pieces of steel. (Doc. 10-3, p. 53). Dr. Head, a vocational expert, testified that Mr. Sullivan had worked as a cashier, a warehouse worker, a material handler, and a bouncer at a bar. (Doc. 10-3, pp. 64-65). The ALJ asked the VE whether there were jobs that a hypothetical person of the same age, education, and past work experience as Mr. Sullivan, capable of sedentary work could perform. (Doc. 10-3, pp. 65-66). The VE testified that the person could perform sedentary unskilled jobs including bench and table monitor, security system monitor, and assembler. (Doc. 10-3, p. 66). Dr. Head testified that if the person had to miss four days a month or be off tasks 20 percent or more during a normal workday, the person could not work competitively. (Doc. 10-3, pp. 66-67). When asked about the upper limits for employer tolerance and absenteeism by Mr. Sullivan's attorney, Dr. Head testified that "no more than 20 workdays a year of absence or no more than two workdays a month for an extended period" would be tolerated. (Doc. 10-3, pp. 67-68).

Returning to the request for a stress test, the ALJ noted that Mr. Sullivan had "a hard issue that's pretty, medically significant." (Doc. 10-3, p. 69). The ALJ stated that "instead of getting another test, I'm going to send the file to a medical expert, and they will say whether it meets or equals, which I can't do, that listing." (Doc. 10-3, p. 69).

*The ALJ's Decision*

Following the hearing, the ALJ issued an unfavorable decision. (Doc. 10-3, pp. 22-24). The ALJ found that Mr. Sullivan had not engaged in substantial gainful activity since September 19, 2017, the application date. (Doc. 10-3, p. 27). The ALJ determined that Mr. Sullivan was suffering from the severe impairments of cardiomegaly,[7] ischemic cardiomyopathy, systolic heart failure, obesity, hepatic steatosis with cirrhosis, hypertension, anxiety disorder with panic attacks, and depression. (Doc. 10-3, p. 27). The ALJ determined that Mr. Sullivan suffered from the non-severe impairments of umbilical hernia, gastroesophageal reflux disease, and alcohol abuse. (Doc. 10-3, pp. 27-28). Based on a review of the medical evidence, the ALJ concluded that Mr. Sullivan did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 10-3, p. 28).

In light of Mr. Sullivan's impairments, the ALJ evaluated Mr. Sullivan's residual functional capacity. The ALJ determined that Mr. Sullivan had the RFC to perform:

> sedentary work as defined in 20 CFR 416.967(a) except the claimant can occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. The claimant can occasionally be exposed to weather or

---

[7] The term cardiomegaly refers to an enlarged heart. Cardiomegaly is not a disease; it is a sign of another condition. https://www.mayoclinic.org/diseases-conditions/enlarged-heart/symptoms-causes/syc-20355436#:~:text=Enlarged%20heart%2C%20in%20heart%20failure,-As%20the%20heart&text=An%20enlarged%20heart%20(cardiomegaly)%20isn,the%20heart%20to%20be%20enlarged. (last visited February 28, 2022).

humidity, extreme cold, or extreme heat.  The claimant can never be exposed to workplace hazards such as moving, mechanical parts and high, exposed places.  The claimant can work in a low stress environment, defined as: tasks that are simple and routine in nature, no inflexible or fast-paced production requirements (such as assembly line work), and no more than occasional changes in the work setting.  The claimant can tolerate no interaction with the public and occasional interaction with coworkers.  The claimant can accept instructions and respond appropriately to supervisors, where his interaction occurs occasionally throughout the workday.

(Doc. 10-3, p. 30).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria is met."  20 C.F.R. § 404.1567(a).

Based on his RFC determination, the ALJ concluded that Mr. Sullivan was not able to perform his past relevant work as a cashier, laborer in stores, material handler, or bouncer.  (Doc. 10-3, p. 34).  Relying on testimony from the vocational expert, the ALJ found that jobs exist in the national economy that Mr. Sullivan could perform, including a bench and table worker, a surveillance system monitor, and an assembler.  (Doc. 10-3, p. 35).  Accordingly, the ALJ determined that Mr. Sullivan had not been under a disability as defined by the Social Security Act since September 19, 2017, the date Mr. Sullivan applied for SSI. (Doc. 10-3, p. 36).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to

provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Mr. Sullivan argues that the ALJ improperly determined that he did not meet Listing 4.02, Chronic Heart Failure.  (Doc. 12, p. 2).  A claimant bears the burden of proving that his impairment meets a Listing.  *See Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).  "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and duration requirement."  *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002).  An impairment must meet all of the specified medical criteria of a Listing.  If an impairment manifests only some of the medical criteria, no matter how severely, it does not meet the Listing.  *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).

The ALJ recognized that Mr. Sullivan has a severe cardiac problem and impairment.  The question, though, is whether Mr. Sullivan meets Listing 4.02.  That Listing, as it relates to Mr. Sullivan's SSI claim, states:

> 4.02 *Chronic heart failure* while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2.  The required level of severity for this impairment is met when the requirements in *both A and B* are satisfied.
>
> A. Medically documented presence of one of the following:

1.  Systolic failure (see 4.00D1a(1)) with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); . . . .

AND

B.  Resulting in one of the following:

1.  Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.02.

Mr. Sullivan argues that his heart condition meets the criteria for 4.02A1. (Doc. 12, p. 3; Doc. 15, p. 5).   He points to evidence of an echocardiogram that demonstrates that his "left ventricle is 8.2cm, almost 33 percent larger than the 6.0 cm requirement, as well as ejection fraction estimated at 15 to 20 percent, which is significantly lower than the 30 percent requirement."  (Doc. 12, p. 3).  Mr. Sullivan also contends that he meets the criteria for 4.02B1.  (Doc. 12, p. 3; Doc. 15, pp. 5-6).  Mr. Sullivan quotes the criteria and states "[w]ith the 4.00C8a(viii) rule applied, the rule itself determines that the risk factor to the individual is too high to perform an exercise stress test."  (Doc. 12, p. 3).   The ALJ found otherwise, stating in conclusory fashion:

I find that the claimant has no impairment which meets the criteria of any of the listed impairments described in Appendix I of the Regulations. Specifically, I have considered Listings 4.02, 4.04, 12.04, and 12.06. The evidence of record does not contain any diagnostic findings, signs, symptoms, or laboratory results that meet any of the listed impairments. Additionally, there are no opinions in the record from medical experts or any other type of medical or psychological consultants designated by the Commissioner, which indicate that the claimant's impairments alone or in combination equal a listing.

(Doc. 10-3, p. 28).

The ALJ's discussion of Listing 4.02 is inadequate, but substantial evidence in the record supports the ALJ's conclusion that Mr. Sullivan does not meet Listing 4.02. Mr. Sullivan correctly points out that his medical records confirm that he meets the ejection fraction criteria in Section A.1 of Listing 4.02. (*See* Doc. 10-8, p. 67; Doc. 10-9, p. 168). But there are two underlying prerequisites for Listing 4.02. For one, medical records must demonstrate that the claimant is "on a regimen of prescribed treatment." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.02. This requirement permits an assessment of heart failure "during a period of stability." *Hines v. Kjakaz*, 2021 WL 3855948, 8 (M.D. Fla. Aug. 30, 2021). Mr. Sullivan's records do not reflect that he was on a regimen of prescribed treatment. As the ALJ pointed out in his analysis of Mr. Sullivan's RFC, Mr. Sullivan frequently refused to take medication prescribed to treat his heart condition, despite urging from his physicians. Mr. Sullivan reported to physicians and nurses that he could not tolerate Plavix, lisinopril, or pantoprazole, and, for almost two years, he refused to have a

heart catheter procedure because he could not take Plavix.  (*See*, *e.g.*, Doc. 10-8, p. 123).

Moreover, to meet the prerequisites for Listing 4.02, while "on a regimen of prescribed treatment," a claimant must have "symptoms and signs described in 4.00D2."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.02.  Under 4.00D2, "[s]ymptoms of congestion or limited cardiac output include easy fatigue, weakness, shortness of breath (dyspnea), cough, or chest discomfort at rest or with activity" or "cardiac arrythmias resulting in palpitations, lightheadedness, or fainting."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00D2b(i).  Mr. Sullivan's medical records reflect that he complained of shortness of breath and chest discomfort a few times.  (Doc. 10-9, p. 54; Doc. 10-11, pp. 12, 80).  But, during visits with his cardiologist, Mr. Sullivan often reported that he did not have chest pain, palpitations, or shortness of breath.  (Doc. 10-8, pp. 70-71, 123, 186; Doc. 10-11, pp. 37-38, 183, 198-99).  Mr. Sullivan's physical examinations often revealed no signs of chronic heart failure.  (Doc. 10-8, pp. 123, 126; Doc. 10-11, p. 183; Doc. 10-12, pp. 3-7).  Mr. Sullivan routinely reported that he could take flights of stairs, walk for miles, and exercise regularly without symptoms of congestion or limited cardiac output.  (Doc. 10-8, pp. 70-71, 111, 123, 151).  At a psychiatry appointment in June of 2018, he explained to his therapist that he worked out using his Total Gym during winter months.  (Doc. 10-10, pp. 188-89).

Even if Mr. Sullivan's medical records had demonstrated that he was taking the medication prescribed for his heart condition and that he had symptoms and signs associated with chronic heart failure, Mr. Sullivan did not satisfy Section B.1 of Listing 4.02.  Mr. Sullivan's medical records contain no evidence that an MC – a medical consultant – concluded that Mr. Sullivan could not perform an exercise test.  His records are silent in this respect.  Mr. Sullivan's records indicate that he was not seriously limited in his "ability to independently initiate, sustain, or complete activities of daily living."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.02B1.  In addition to regular exercise and walking, Mr. Sullivan testified that he could cook, clean the house, wash dishes, shop, drive, and care for his personal needs.  (Doc. 10-3, pp. 60-61).  At the request of Disability Determination Services, CRNP Cassandra Frieson examined Mr. Sullivan and determined that, despite his limitations, Mr. Sullivan could perform activities of daily living.  (Doc. 10-9, p. 179).  Treatment records from Mr. Sullivan's visits with the primary care clinic and the cardiology clinic at the VA Hospital support CRNP Frieson's conclusion.  (Doc. 10-8, p. 66; Doc. 10-12, pp. 64-65).

Mr. Sullivan argues that the ALJ should have used the procedure in § 4.00C8a(viii) which relates to ALJ-ordered exercise stress tests.  (Doc. 12, p. 2).  Mr. Sullivan assumes that if the ALJ had considered an exercise stress test, under § 4.00C8a(viii), an MC would have refused the test based on his (Mr. Sullivan's)

medical records, allowing Mr. Sullivan to satisfy §4.02B1. (Doc. 15, p. 5). As Mr. Sullivan points out, § 4.00B5 provides that "[i]n appropriate situations," the Commissioner "will purchase studies necessary to substantiate the diagnosis or to document the severity of your impairment, generally after we have evaluated the medical and other evidence we already have." The regulation also states that the Commissioner will not pay for a study "involving exercise testing if there is a significant risk involved or if there is another medical reason not to perform the test." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00B5. An ALJ must consider whether to purchase an exercise test when there is a question about whether a cardiovascular impairment meets or equals a listing, the claimant's medical records lack test evidence, and the Commissioner cannot find the claimant disabled on another basis or when there is insufficient evidence in the record to make an RFC determination. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00C6.

At the administrative hearing, the ALJ stated that he planned to send Mr. Sullivan's medical records to a medical expert because he was not able to say whether Mr. Sullivan's cardiac impairment met or equaled Listing 4.02. (Doc. 10-3, p. 69). The ALJ indicated that he did not think he could determine whether he needed an exercise test until he received a report from a medical expert. The ALJ sent Mr. Sullivan's records to Dr. Beverly Yamour. Dr. Yamour concluded that there was enough medical evidence in Mr. Sullivan's records to allow her to form

opinions about the nature and severity of Mr. Sullivan's cardiac impairment.  (Doc. 10-13, p. 54).  She also concluded that Mr. Sullivan did not meet Listing 4.02 for chronic heart failure, and he did not meet Listing 4.04 for ischemic heart disease because he did not have angina.  (Doc. 10-13, p. 56).  Given the medical expert's conclusion that Mr. Sullivan's medical records were adequate to allow her to assess whether Mr. Sullivan met or equaled a Listing, the ALJ did not have to order a stress test.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.00C6.

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 2, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE